UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:

X-PRESS CONTAINER LINE (UK) LTD,

    Plaintiff,

vs.

JAMILA SHIPPING COMPANY LIMITED,

    Defendant.
_____/

**VERIFIED COMPLAINT TO AND FOR MARITIME
ATTACHMENT/GARNISHMENT UNDER SUPPLEMENTAL
<u>ADMIRALTY RULE B</u>**

Now comes the Plaintiff, X-PRESS CONTAINER LINE (UK) LTD (X-PRESS), in the above entitled action, by and through its counsel and files its Complaint for breach of charter Awards and for Maritime Attachment/Garnishment under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

    1.    This is an action for breach of Charter Party.

    2.    Additionally, this is an action for Rule B Attachment to attach and garnish funds owned by JAMILA and held by a garnishee presently located in the State of Florida, including, without limitation, those in the hand of garnishee Seaboard Marine, Ltd., ("Seaboard") as security to pay.

    3.    Jurisdiction is based on Admiralty and Maritime jurisdiction within the meaning of Fed.R.Civ.P. 9(h) and 28 U.S.C. § 1333.

## PARTIES

4. X-PRESS is a corporation duly organized and existing under the laws of the United Kingdom

5. X-PRESS is engaged in the business of, *inter alia,* chartering vessels.

6. On information and belief JAMILA is an entity which is organized under the laws of Liberia, and has a place of business located in Germany.

7. On information and belief, Seaboard is a Florida entity registered to transact business in Florida, and has an office located in Miami, Florida.

## CHARTER PARTY AND LONDON LITIGATION

8. The Defendant is and was at all material times the disponent owner of the containership "JAMILA" ("**the Vessel**").

9. X-PRESS was at all material times the charterer of the Vessel from the Defendant pursuant to a time charterparty on an amended NYPE 1946 form dated 10 May 2016 for a period of between five and eleven months ("**the Charterparty**"). By way of Addendum No. 2 to the Charterparty dated 26 September 2017, the Charterparty was extended (in direct continuation of the original period, from 00:01 hours LT on 31 October 2017) for a further period of between three and five months at a hire rate of US$8,500 per day.

10. The Charterparty provided in relevant part as follows:

> *"2. That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed ...*
>
> *5. Payment of said hire to be made ... every 15 days in advance and Charterers may deduct from the last sufficient hire payments estimated bunkers on redelivery, estimated Owners' disbursements and any estimated offhire time ...*
>
> *8. That the Captain shall prosecute his voyages with the utmost despatch ...*

*15. That in the event of the loss of time from deficiency and/or default of men ... breakdown or damages to hull, machinery or equipment, ... or by any other cause whatsoever preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost ...*

*18. .... Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once ..."*

*20. Fuel used by the vessel while off hire to be agreed as to quantity, and the cost of replacing same, to be allowed by Owners.*

*Clause 33  Bunkers quantities / prices*
*Estimated bunkers remaining on board at time of delivery : about 400 mt HFO and about 60 mt MGO ... Charterers shall redeliver the vessel with approximately the same quantities/qualities as on delivery. Bunkers on redelivery to be taken over and paid for by Owners basis Platts Oilgram prices at the port of redelivery / on the day of redelivery, or nearest thereto.*

*Clause 34  Bunker specification*
*Charterers shall bunker the vessel, always under Master's and Chief Engineer's supervision, with fuels in accordance with ISO 8217:2005 RMG 380 and Gasoil in accordance with ISO 8217:2005 DMB. Bunkers to be of stable nature and not to contain any of the following substances: phenols, styrenes, inorganic acids, used or waste lubricating oils, refinery waste, tar oil or other recognised harmful substances.*

*During this charter, the Master or his representative shall always supervise the bunkering operations and ensure that the supply samples are properly drawn jointly with the supplier's representative. Such samples with their identification or serial number should be clearly spelt out in the Bunker Delivery Report (BDR) as the official retained samples.*

*Official BDR Fuel samples will be retained by the vessel from the date of delivery for a reasonable period to ensure that in the event of a dispute Owners' position with regard to the supplier is fully protected.*

*In case of any quality dispute, the samples as specified in the BDR are to be tested by a mutually agreed fuel analysis laboratory and the result to be considered as final and binding. Charterers shall have the right to arrange for a surveyor at their time/expense to obtain fuel samples from the vessel, at any time, for laboratory analysis.*

*Vessel will participate in an independent fuel quality testing programme, where additional samples may be taken during each bunkering. However, any samples taken under vessel's fuel quality testing programme are for reference only and shall in no way contradict the official samples specified in the Bunker Delivery Report (BDR). However Charterers shall contribute USD 150 per bunkering towards the cost of same.*

*All costs of actual sludge removal/disposal always to be for Owners account.*

> *Mandatory fees levied by Port Authority when no sludge is removed/disposed are to be for Charterers account*
>
> ***Clause 40  Off Hire***
> *In the event of loss of time, either in port or at sea ..... by reason of the refusal of the Captain or crew to perform their duties ... the hire shall be suspended ... All direct proven expenses  incurred including bunkers consumed during such period of suspension shall be for Owners' account."*

11.     In the premises, it was an express, alternatively implied, term of the Charterparty (to be implied in order to give effect to the unexpressed but common intention of the parties and / or as  necessary to give the contract business efficacy) that, upon redelivery of the Vessel, there would  be a final accounting exercise pursuant to which: (i) each party would pay to the other any  outstanding sums which were for that party's account pursuant to the terms of the Charterparty; and (ii) JAMILA would repay to X-PRESS any hire paid in advance but which had not been earned (hereafter, "**the accounting obligation**").

**The Relevant Events**

12.     On 30 October 2017, in accordance with the X-PRESS' instructions and X-PRESS' obligations pursuant to the Charterparty, KPI Bridge Oil Limited ("**the Supplier**") supplied 899.8750 mts of IFO 380 CST ("**the Fuel**") to the Vessel. The bunkering operation was supervised by the Chief Engineer who signed the Bunker Delivery Receipt ("**the Bunker Receipt**"). The Chief Engineer (together with a bunker surveyor appointed by the Claimant) further witnessed the taking of supply samples of the Fuel by the Supplier's representative, being the "official BDR Fuel samples" referred to in Clause 34 of the Charterparty, "**the BDR Samples**") in accordance with the terms of the same.

13.     A dispute then arose between the parties as to whether the fuel was off-spec. P.

14. The testing of the BDR Sample took place on 12 December 2017, the breaking of the seal being witnessed by the JAMILA's representative, Captain Wozniak, the results confirmed that the Fuel was on-specification. On 5 February 2018, the BDR Sample was re-tested by Inspectorate as the parties' mutually agreed fuel analysis laboratory on 5 February 2018. The seal-breaking was witnessed by the JAMILA's representative, Captain Wozniak. According to Inspectorate's test results and conclusions, the Fuel met the requirements of both ISO 8217:2005 (being the contractual specification for the Fuel and which does not include any FAME requirement) and also (but without prejudice to the foregoing) the requirements of ISO 8217:2010 (which requires the FAME content of diesel fuel to be *"de minimis"*, being no more than approximately 0.1%). More specifically, the GCMS and FAME testing carried out by Inspectorate indicated that the Fuel contained only 99.3 mg/kg of FAME (and thus well below the *"de minimis"* level prescribed in ISO 8217:2010). However, JAMILA alleges the fuel was off spec. The parties were not able to agree on this issue.

15. The BDR Sample had been tested by a mutually agreed laboratory, the results were final and binding on the parties pursuant to Clause 34 of the Charterparty.

### The Defendant's Breach(es) of the Charterparty / Off-Hire

16. By reason of the facts and matters set out above, it is the Claimant's case that:

(1) Pursuant to Clause 34 of the Charterparty:

  (a) Inspectorate was appointed as the parties' mutually agreed fuel analysis laboratory for the purposes of Clause 34;

  (b) The results of the testing of the BDR Sample carried out by Inspectorate on 12 December 2017, and those of 5 February 2018 (hereafter **"the BDR Sample test results"**), are final and binding between the parties. As set out above, those results all confirmed that the Fuel was on- specification.

In the premises, it neither was, nor is, open to JAMILA to seek to rely on any other tests results and the same are of no legal relevance to the parties' rights and obligations pursuant to the Charterparty.

17. As a result of this dispute the vessel was off hire several times (See Exhibit A, which is attached hereto and made a part of hereof). In order for X-PRESS to service its clients, it was compelled to provide additional fuel.

18. As set out above, in circumstances where JAMILA refused to burn the Fuel and / or otherwise proceed with the chartered voyage(s) as per the terms of the Charterparty, acting in reasonable mitigation of its actual and / or potential losses due to the associated delay to the Vessel and / or associated losses, costs and expenses, X-PRESS was obliged to supply MGO to the Vessel as an alternative fuel.

19. As a result of JAMILA's breach of the Charterparty, X-press has sustained damages in the sum of $579,511.11 (See Ex B which is attached hereto and incorporated herein).

20. As a result of JAMILA's breach of Charterparty – X-PRESS filed suit in London against JAMILA, to which JAMILA responded and asserted a counterclaim.

21. X-PRESS has agreed to provide security by way of P&I Club LOU. JAMILA has refused to provide security.

## COUNT II

22.     X-PRESS reiterates and reaffirms the allegations contained in Paragraphs 1-15 inclusive and incorporates same as if fully set forth herein.

23.     Upon information and belief, and after investigation, the Defendant, JAMILA, cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but X-PRESS is informed that Garnishee Seaboard has, or will shortly have, assets comprising, *inter alia,* cash, funds, escrow funds, credits, debts, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, cargo, vessels, or any other assets of, belonging to, due or being transferred to, from, or for the benefit of JAMILA (collectively hereinafter, "ASSETS"), including but not limited to ASSETS as may be held, received or transferred in its name or for its benefit, at, moving through, or being transferred to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein. Such ASSETS include, but are not limited to, funds that Seaboard owes to JAMILA, in the form of a debt, in connection with the work already preformed and/or to be performed in the future by JAMILA for Seaboard in connection with the charter by Seaboard of the M/V JAMILA.

24.     Because Seaboard is present within the jurisdiction of this Honorable Court, said funds that Seaboard owes to JAMILA, in the form of a debt is deemed within the jurisdiction of this Court and is subject to garnishment to settle and serve as security for the debt owed by JAMILA to X-PRESS.

25.     The total amount to be attached pursuant to the calculation set forth above 1s US $579,511.11.

WHEREFORE, Plaintiff, EXPRESS., prays:

    a.    That process in due form of law according to the practice of this Court may issue against JAMILA, citing it to appear and answer the foregoing, failing which default may be taken;

    b.    That if JAMILA cannot be found within this District pursuant to Supplemental Rule B all tangible or intangible property of JAMILA up to and including the sum of US $579,511.11 be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, cargo and/or vessels, of, belonging to, due, held or being transferred to, from, or for the benefit of JAMILA at, moving through or being transferred to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein, such garnishees including, but not limited to Costa as set forth herein;

    c.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to an order entered against JAMILA in the London proceedings; and

    d.    For such other, further and different relief, including but not limited to attorneys' fees, interest, costs and disbursements, as this Court may deem just and proper in the premises.

CASE NO.:
PAGE 9

Dated:  November 28, 2018
       Miami, Florida

          Respectfully submitted,

          X-PRESS CONTAINER LINE, (UK) LTD.,

          By its attorney:
          HORR, NOVAK & SKIPP, P.A.

          */s/ David J. Horr*
          **David J. Horr**
          Florida Bar No. 310761
          dhorr@admiral-law.com
          HORR, NOVAK & SKIPP, P.A
          Two Datran Center, Suite 1700
          9130 South Dadeland Boulevard
          Miami, FL  33156
          Telephone: (305) 670-2525
          Facsimile: (305) 670-2526
          ***Attorneys for Plaintiff***

          AND

          */s/ William B. Milliken*
          **William B. Milliken**
          Florida Bar No.: 143193
          wmilliken@admiral-law.com
          HORR, NOVAK & SKIPP, P.A
          Two Datran Center, Suite 1700
          9130 South Dadeland Boulevard
          Miami, FL  33156
          Telephone: (305) 670-2525
          Facsimile: (305) 670-2526
          ***Attorneys for Plaintiff***

CASE NO.:
PAGE 10

## VERIFICATION

WILLIAM B. MILLIKEN being duly sworn, deposes and says as follows:

I am Counsel for X-PRESS CONTAINER LINE (UK) LTD, in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

_____
WILLIAM B. MILLIKEN